Filed 8/27/19

# CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BONIFACIO CRUZ CADENA,<br><br>    Defendant and Appellant. | B281175<br><br>(Los Angeles County<br>Super. Ct. No. KA112281) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed in part and reversed in part with directions.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

    * Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III–V of the Discussion *post*, at pp. 26–32.

A jury convicted defendant Bonifacio Cruz Cadena of six counts of lewd acts upon a child:  three acts against each of his two nieces.  (Pen. Code, § 288, subd. (a).)[1]  The jury also found true the special circumstance allegation that he committed the acts against more than one victim.  (§ 667.61, subds. (b) & (e).)  Pursuant to the "One Strike" law (§ 667.61), the trial court sentenced him to an aggregate term of 30 years to life in state prison, consisting of consecutive 15-years-to-life terms on two counts—one for each victim—and concurrent 15-years-to-life terms on the remaining four counts.

Defendant contends the following:  (1) There was no substantial evidence to support the finding that he committed more than two lewd acts on each victim; (2) His sentence violates the constitutional prohibition against cruel or unusual punishment; (3) His counsel was constitutionally deficient for failing to object to expert witness testimony on child sexual abuse accommodation syndrome; (4) The trial court should be afforded an opportunity to strike the multiple victim enhancement; and (5) The trial court miscalculated his presentence custody credit.  We agree that the evidence supported findings as to only two lewd acts on each victim and that his sentence is unconstitutionally excessive.  We therefore vacate the convictions on two counts, reverse the judgment, and direct the court to hold a new sentencing hearing.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, defendant was 44 years old and married with two children. The four of them shared an apartment with defendant's sister, his sister's husband (Mario), and their five children, including twin sisters G. and M. All seven children slept in the living room, with G. and M. sharing a bed.

During the summer of 2014, when G. and M. were 11 or 12 years old, the girls would sometimes wake up around 3:00 a.m. to see defendant near their bed. Once, M. awoke to find defendant removing a blanket that covered her. Defendant told her that he was trying to kill a bug he had seen. On other occasions, G. and M. would awaken and find defendant touching them over their clothes on their stomachs or their "vagina[s]."[2] This made G. feel "uncomfortable" because she had "never been touched there." M. also felt "uncomfortable," as well as "confused" because defendant had "always [been] respectful" toward them.

G. and M. conferred and learned that defendant had touched the other in the same way. They told their father, Mario, who then installed an inconspicuous video camera on the girls' bed. The camera subsequently recorded video of someone's arm and a hand touching and rubbing M. on top of her clothes in her

---

[2] Because the offensive touching occurred over the clothes of G. and M., the witnesses and counsel appear to have used the term "vagina" colloquially—albeit inaccurately—to refer generally to female genitalia or " 'private parts.' " (See *People v. Paz* (2017) 10 Cal.App.5th 1023, 1037; *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1367.) For the sake of consistency, we will use the term in the same way.

pubic area for about 12 seconds. The video does not show the perpetrator's face. At trial, Mario said he recognized the arm in the video as defendant's.

Mario confronted defendant and asked, "Why was he molesting [Mario's] children?" According to Mario, defendant initially denied the accusation, but ultimately admitted to touching the girls, asked Mario to forgive him, and promised "that he was not going to do that anymore." Mario agreed to forgive him.

Defendant continued to live in the apartment with the others, and did not touch the girls again. For a while, G. did not "really talk" to defendant. But they eventually began talking again.

More than one year after defendant last touched the girls, G. told a tutor at her middle school about the incidents.[3] The tutor informed child protective services personnel, who contacted the police.

During a police interview, defendant admitted he had touched the girls on their legs or their vaginas one or two times, and only over their clothes. When asked why he touched them, defendant stated: "I didn't have any intention of doing harm or anything, just, I don't know, the devil came to my mind. I don't know." He stated that he regrets his actions and that he

_____

[3] The tutor testified that G. told her that her uncle had raped her. G., however, denied that she had said this, and the prosecution did not rely on the tutor's statement. Indeed, the prosecutor argued to the jury that defendant's offensive touching was "through the clothing. There's no testimony it was skin to skin."

had asked Mario for forgiveness and said it would not happen again, and it has not.  He and the girls, defendant stated, now talk and "get along well."  Defendant added that he has "changed" and "it won't happen, not even with any other person."

G. and M. testified about the touching incidents at trial. G. said that defendant touched her on her stomach or vagina "two to three times."  M. testified he touched her stomach and vagina "like, three or two times."  She described the touching as grabbing or rubbing.  G. also said that defendant "hadn't done anything to [them]" since Mario confronted him, and "everything was fine."  M. testified that she felt conflicted about the criminal prosecution because although defendant "did a wrong," he "knew he did a wrong," and he "accepts it."

Dr. Jayme Jones, an expert on child sexual abuse, testified that child sexual abuse accommodation syndrome (CSAAS) is a model that provides insight into why children do or do not disclose sexual abuse.  Dr. Jones described five components of CSAAS:  (1) express or implied secrecy concerning the incident; (2) the child's helplessness; (3) accommodation of the abuse; (4) delayed or partial disclosure; and (5) recanting.  Dr. Jones did not interview G., M., or any of the witnesses in the case, and did not offer any opinion as to whether G. or M. was a victim of sexual abuse.

Defendant testified at trial that he did not touch the "private areas" of G. or M.  He said he admitted doing so during the police interrogation because he understood it would help him "when [he went] to see the judge."  The hand that is shown in the video recording of someone touching M., he stated, was not his hand.

5

Defendant's wife, children, and parents testified that defendant is a youth leader in their church, is respected by others, treats others with respect, and has never shown any tendency to touch children in a sexual manner. He has worked with children in a church choir for about 10 years and no one has alleged that he molested any of the children.

A jury found defendant guilty of six counts of lewd acts upon a child and found true the special circumstance allegation that he committed the acts against more than one victim. (Pen. Code, §§ 288, subd. (a), 667.61, subds. (b) & (e).)

According to a probation officer's report submitted in connection with the sentencing hearing, defendant had been convicted in 1991, when he was 21 years old, of driving under the influence of alcohol, and driving with a suspended license. (Veh. Code, §§ 14601.1, subd. (a), 23152, subds. (a) & (b).) Defendant had no other criminal history prior to the convictions in this case.

The probation report includes a statement by Mario to the probation officer "that he, his daughters, and his family have forgiven the defendant" and that "the defendant should not go to prison." Mario added that "his daughters have had an evaluation and two counseling sessions and both are fine."

The trial court sentenced defendant under the One Strike law (§ 667.61) to an aggregate term of 30 years to life in state prison, consisting of consecutive 15-years-to-life terms on two counts, one for each victim, and concurrent 15-years-to-life terms on the remaining four counts.

Defendant timely appealed.

## DISCUSSION

## I.    No Substantial Evidence Supported Two of the Lewd Conduct Counts

Defendant was convicted of three counts of lewd conduct involving each child, for six total counts.  Yet G. and M. testified that each child was only touched "two or three" times, or "two to three" times.  Defendant contends evidence that he touched the children two or three times each does not support a conviction for touching either one a third time.  The Attorney General does not appear to disagree, but argues additional evidence supported the convictions.

Subdivision (a) of section 288 makes it a felony to "willfully and lewdly commit[] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  "The elements of section 288, subdivision (a) are:  (1) a lewd touching[,] (2) of a child under 14 years of age[,] (3) with the intent of sexual arousal."  (*People v. O'Connor* (1992) 8 Cal.App.4th 941, 947.)

"In considering a claim of insufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Earp* (1999) 20 Cal.4th 826, 887.)  To support each count of lewd and lascivious conduct alleged in an information, the "victim . . . must describe *the kind of act or acts committed*" and "the *number of acts* committed with sufficient certainty . . . (e.g., 'twice a

7

month' or 'every time we went camping')." (*People v. Jones* (1990) 51 Cal.3d 294, 316.)

Here, because testimony by the girls that defendant touched each of them two or three times is certain as to only two instances of unlawful conduct, not three, it supports convictions on only two counts each. For the jury to have found defendant guilty of a third count of lewd conduct as to either G. or M. there had to have been other evidence of such conduct.

In addition to G. testifying that defendant touched her stomach or vagina "two or three" times, M. testified that she saw defendant "like, reaching over my, like, twin sister, I guess, trying to touch her or something." The Attorney General argues that this testimony supports defendant's conviction on a third count for committing a lewd act upon G. We disagree. It is unclear whether M. was describing one of the two instances of lewd touching that G. had already related or a third instance. And M. did not testify that defendant actually touched G., only that he was "trying" to touch her "or something." Even if he had touched her on this occasion, nothing in M.'s testimony indicated he did so lewdly, with the intent of arousing, appealing to, or gratifying his lust, passions, or sexual desires.

After M. testified that defendant touched her vagina twice, the prosecutor asked, "What about your stomach? Do you remember ever talking about that?" M. replied, "I don't remember exactly. But I remember he would, like, touch me. But the thing is, I don't remember where because, like, I was tired. So I was asleep." The Attorney General argues that this testimony supports a third touching incident, and a lewd or lascivious touching may occur when one touches any part of a child's body. We do not disagree, but, again, M. testified only

that she was touched somewhere other than her vagina, but said nothing about the nature of that touching. Not every touch by a man who once touched a girl lasciviously is itself lascivious.

Both girls testified that they would sometimes awaken to see defendant standing over them, looking at them. The Attorney General argues that a rational juror could conclude from this evidence that defendant committed lewd acts upon each child before they woke up, i.e., on occasions other than those to which they testified. We disagree. Like the nonspecific or attempted touching described by the girls, ominous staring does not itself constitute evidence of lascivious touching.

We conclude the evidence supports defendant's convictions on only two counts of lewd or lascivious conduct as to each child, and will order that the third conviction as to each child be vacated.

## II. Defendant's Indeterminate Life-Maximum Sentence is Unconstitutionally Excessive

Defendant contends that his 30-years-to-life sentence violates California's constitutional prohibition against cruel or unusual punishment.[4] (Cal. Const., art. I, § 17.) We agree.

---

[4] Defendant did not raise this argument below. Although that failure would ordinarily forfeit the argument on appeal, we exercise our discretion to address the argument because it presents an important question of law that requires no further factual development in the trial court. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 887–889; *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310; *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

When, as here, a defendant contends that his sentence is unconstitutionally excessive, "[t]he judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) "Yet legislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition." (*In re Lynch* (1972) 8 Cal.3d 410, 414 (*Lynch*).)[5]

Punishment is unconstitutionally cruel or unusual "if it is grossly disproportionate to the offense as defined or as committed, and/or to the individual culpability of the offender." (*People v. Dillon* (1983) 34 Cal.3d 441, 450 (*Dillon*) (plur. opn. of Mosk, J.).) Stated differently, if the punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity," it is unconstitutionally excessive. (*Lynch*, *supra*, 8 Cal.3d at p. 424; see *People v. Leonard* (2007) 40 Cal.4th 1370, 1426–1427.)

---

[5] Our Supreme Court is currently considering whether a habeas petitioner's sentence of life with the possibility of parole for a minor's commission of kidnapping for robbery is unconstitutionally disproportionate. (*In re Palmer* (2019) 33 Cal.App.5th 1199, review granted July 31, 2019, S256149.)

Courts have found such disproportionality by: (1) examining "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society"; (2) comparing the punishment with punishments for more serious crimes in the same jurisdiction; or (3) comparing the punishment with punishments for the same offense in other jurisdictions. (*Lynch*, *supra*, 8 Cal.3d at pp. 425–428; accord, *Dillon*, *supra*, 34 Cal.3d at p. 478 (plur. opn. of Mosk, J.).) Any one of these methods "can be sufficient to demonstrate that a particular punishment is cruel and unusual." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64–65.)

The nature of the offense is evaluated based upon " 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Dillon*, *supra*, 34 Cal.3d at p. 479 (plur. opn. of Mosk, J.).)

The inquiry into the nature of the offender "focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, *supra*, 34 Cal.3d at p. 479 (plur. opn. of Mosk, J.).)

Two cases are particularly instructive: *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*) and *People v. Baker* (2018) 20 Cal.App.5th 711 (*Baker*). In *Rodriguez*, a habeas corpus petitioner had committed statutory rape when he was 19 years old and two years later was arrested for molesting a child. (*In re Rodriguez*, *supra*, 14 Cal.3d at p. 644, fn. 6.) He was diagnosed

11

a " 'sexual psychopath' " and committed to a state hospital. (*Ibid.*) He eventually escaped from the institution with another patient, whom he later married. (*Ibid.*) Less than two years later, he and his wife were driving in their car when they saw a six-year-old girl roller skating. (*Id.* at p. 643, fn. 5.) He put the girl in the car, and "drove to a less public place where [he] fondled the child's private parts." (*Ibid.*) "[C]urious citizens investigated the parked car, [and] found that the child's skirt was raised above her knees and that petitioner's trousers were unzipped." (*Id.* at pp. 643–644, fn. 5) A medical "examination showed no penetration of the sexual organs of the victim." (*Id.* at p. 644, fn. 5.) The petitioner was convicted of violating section 288, and sentenced to prison for an indeterminate term of one year to life. By the time the Supreme Court decided his habeas corpus petition, he had served 22 years of that term. The Court issued the writ and directed the petitioner be released from custody because the time he had served exceeded that permitted under the cruel or unusual punishment proscription of the California Constitution. (*Id.* at p. 656.)

In considering the nature of the offense, the *Rodriguez* Court acknowledged that the petitioner's crime was "by no means 'trivial,' " but explained that its commission involved no violence or weapon, caused no physical harm to the victim, and "lasted only a few minutes." (*Rodriguez*, *supra*, 14 Cal.3d at pp. 654–655.) The petitioner also "attempted none of the dangerous offenses sometimes associated with violations of section 288." (*Id.* at p. 655.) Regarding the offender, the Court observed that the petitioner "was only 26 years old" when he committed the crime, and his conduct could be "explained in part by his limited intelligence, his frustrations brought on by

12

intellectual and sexual inadequacy, and his inability to cope with these problems." (*Ibid.*)[6] The petitioner also had "no history of criminal activity apart from problems associated with his sexual maladjustment." (*Ibid.*)

The *Rodriguez* Court also compared the petitioner's punishment with sentences under California law for more serious crimes and the punishment for similar crimes in other states, and found both comparisons supported its conclusion that the petitioner's punishment constituted cruel and unusual punishment. (*Rodriguez, supra,* 14 Cal.3d at pp. 655–656.)

In *Baker*, the court upheld a 15-years-to-life sentence for one count of oral copulation of a six-year-old girl, in violation of section 288.7, subdivision (b),[7] and two counts of lewd acts in violation of section 288, subdivision (a). (*Baker, supra,* 20 Cal.App.5th at p. 715.) The defendant was a 50-year-old uncle of the victim. (*Id.* at p. 716.) While the defendant was visiting with the victim's family, he brought the victim into bed with him, rubbed her stomach, pulled down her underwear, licked her " 'on the middle,' " and asked her if it felt good. (*Id.*

---

[6] The petitioner had an I.Q. of 68 and was "functionally illiterate and unskilled." (*Rodriguez, supra,* 14 Cal.3d at p. 644, fn. 6.) He asserted that he was led to commit his crime against the six-year-old girl because he discovered "that his wife was sterile," which "frustrated his intense desire to have children." (*Ibid.*)

[7] Section 288.7, subdivision (b) provides: "Any person 18 years of age or older who engages in oral copulation . . . with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

at pp. 716–717.)  The victim said, " 'No, it's gross.' "  The defendant then kissed the victim on her mouth with a " 'lick kiss.' "  (*Ibid*.)  The victim pulled a blanket over her face.  (*Id*. at p. 716.)  The defendant said he was sorry, and they went to sleep. (*Id*. at p. 717.)  The next morning, the child told her mother about the incident, and the mother contacted the sheriff's department. (*Id*. at p. 716.)  The defendant's DNA was found on a genital swab from the victim, and saliva was found in the crotch of her underwear.  (*Ibid*.)  The victim told a social worker that "she kept thinking about what happened and felt 'disgusting.' "  (*Id*. at p. 717.)

In evaluating the nature of the offense in *Baker*—oral copulation of a six-year-old child—the court began by noting that there is " 'a strong public policy to protect children of tender years.' "  (*Baker*, *supra*, 20 Cal.App.5th at p. 724.)  Although the child victim "was not physically harmed," she had told a "social worker she felt 'disgusting' and kept thinking about what had happened, indicating at least some level of psychological harm."  (*Id*. at p. 725.)  The court considered that the child "was particularly vulnerable given her age, and the defendant abused a position of trust to commit the offense."  (*Ibid*.)  The court also found significant the fact that the defendant "perpetrated not one but *three* sexual acts against [the victim].  He touched her vagina, orally copulated her, and then kissed her mouth.  Although the three acts took place within a short period of time, Baker did not stop the molestation immediately and proceeded to kiss her on the mouth after she said the oral copulation felt 'gross.' [The victim] had to pull a blanket over her face to make him stop."  (*Ibid*.)

14

The *Baker* court distinguished *Rodriguez*, stating that the facts before it "are significantly more aggravated than those in *Rodriguez*." (*Baker*, *supra*, 20 Cal.App.5th at p. 727.) "Whereas Rodriguez was convicted of unspecified fondling of a six-year-old child, Baker was convicted of oral copulation—conduct that the Legislature has since made clear is more heinous. [Citations.] And Baker was convicted of not one but three separate sexual acts against [his victim]." (*Id*. at p. 726.) The court also stated that it did not appear that the defendant had a low I.Q., was "illiterate or unskilled, or [was] coping with problems of sexual inadequacy." (*Ibid*.)

We turn now to the instant case.

When evaluating the constitutionality of an indeterminate sentence, "it is the maximum term prescribed by the statute . . . which must survive constitutional scrutiny." (*Lynch*, *supra*, 8 Cal.3d at pp. 416–417.) Therefore, we must determine whether defendant's indeterminate life-maximum sentence withstands constitutional scrutiny in this case, without regard to the fact that defendant may be eligible for parole after serving 30 years of his term. (See *ibid*.; *Baker*, *supra*, 20 Cal.App.5th at p. 723.)

Defendant was sentenced under the One Strike law, which the Legislature "enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction." (*People v. Palmore* (2000) 79 Cal.App.4th 1290, 1296.) The Legislature "targeted" the law at those who "prey[] on women and children, cannot be cured of [their] aberrant impulses, and must be separated from society to prevent reoffense." (*People v. Wutzke* (2002) 28 Cal.4th 923, 929–930.) "Almost all of the enumerated crimes involve the use of force or fear." (*Id*. at p. 930.) Indeed, the only enumerated crimes

15

that do not require such use are the crimes of continuous sexual abuse of a child (§ 288.5) and the crime defendant committed in this case—lewd and lascivious acts in violation of section 288, subdivision (a). (§ 667.61, subd. (c)(8) & (9).)

Commission of an enumerated crime is not enough to trigger a 15-years-to-life term under the One Strike law; the enumerated crime must also involve at least one additional circumstance, such as the perpetrator kidnapping the victim, committing the sexual offense during a burglary, using a dangerous or deadly weapon or firearm, tying or binding the victim, administering a controlled substance to the victim, or, as in this case, committing the offense "against more than one victim."[8] (§ 667.61, subd. (e); see *People v. Luna* (2012) 209 Cal.App.4th 460, 471.)

Defendant does not challenge—and we do not address— the constitutionality of the One Strike law in the abstract or even of life sentences imposed under that law for violations of section 288, subdivision (a).[9] Indeed, as the *Rodriguez*

---

[8] The One Strike law also provides for 25-years-to-life sentences if certain other or additional circumstances exist. (§ 667.61, subd. (a).)

[9] Courts have upheld sentences imposed under the One Strike law under circumstances involving more heinous crimes. (See, e.g., *People v. Reyes* (2016) 246 Cal.App.4th 62, 68-70, 87-88 [defendant committed forcible rape and oral copulation against a minor during a burglary]; *People v. Alvarado* (2001) 87 Cal.App.4th 178, 200 [forcible rape during burglary]; *People v. Crooks* (1997) 55 Cal.App.4th 797, 806–807 [forcible rape while armed with a deadly weapon during a burglary].)

Court observed, "section 288 encompasses conduct for which [a] life [sentence] might be a permissible punishment in some cases." (*Rodriguez, supra,* 14 Cal.3d at p. 647.) But a statutory punishment that may be permissible in the abstract, "is nevertheless constitutionally impermissible if it is disproportionate to the defendant's individual culpability." (*Dillon*, *supra*, 34 Cal.3d at p. 480 (plur. opn. of Mosk, J.).) Thus, although life sentences for violating section 288, subdivision (a), may be permissible under the One Strike law "in some cases," they may be unconstitutionally "excessive in others." (*Rodriguez, supra,* 14 Cal.3d at p. 647.) Defendant contends that his life sentence in this case is excessive.

Regarding the nature of the offense, we observe that defendant's offenses were, like the offense committed in *Rodriguez*, "by no means 'trivial' " (*Rodriguez*, *supra*, 14 Cal.3d at pp. 654–655), and that although "lewd conduct on a child may not be the most grave of all offenses, . . . its seriousness is considerable" (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806 (*Christensen*)). The offenses were, however, far less serious than the petitioner's conduct in *Rodriguez* and the defendant's actions in *Baker*. Defendant committed the crimes by touching the girls' private parts above their clothes; he did not touch their skin.[10] By contrast, the petitioner in *Rodriguez*

---

[10] Although a lewd or lascivious act under section 288 does not require a touching of the victim's skin (*People v. Martinez* (1995) 11 Cal.4th 434, 444), the Legislature has determined that touching a victim's sexual organs over the victim's clothes should not be punished as harshly as touching the victim's skin directly. (Compare § 243.4, subds. (a)–(d) & (f) [felony sexual battery requires the touching of the victim's skin] with § 243.4,

"fondled the child's private parts" (*Rodriguez, supra*, 14 Cal.3d at p. 643, fn. 5); and the defendant in *Baker* rubbed the victim's stomach, orally copulated her, and gave her "a 'lick kiss.' " (*Baker*, *supra,* 20 Cal.App.5th at p. 717.)  He did not transport the girls to another location, as the petitioner did in *Rodriguez*, or bring them into bed with him, as in *Baker*.  (*Rodriguez*, *supra*, 14 Cal.3d at p. 643, fn. 5; *Baker*, *supra*, 20 Cal.App.5th at p. 716).  He did not use a weapon, force, fear, threats, or intimidation.  The six-year-old victims in both *Rodriguez* and *Baker* were also considerably younger than G. and M., justifying greater punishment for crimes committed against them.  (See, e.g., §§ 288.7, subds. (a) & (b) [sexual offenses against children 10 years of age or younger punishable by up to life in prison], 1170.72 [the age of victim under 11 years may be considered an aggravating circumstance in sentencing].)

There is no evidence of defendant's motive or intent other than his statements to police that he did not "have any intention of doing harm or anything."  Nor is there any evidence that defendant planned to escalate his behavior beyond the over-the-clothes touchings he committed or that he "attempted [any] of the dangerous offenses sometimes associated with violations of section 288." (*Rodriguez*, *supra*, 14 Cal.3d at p. 655.) By contrast, the defendant in *Baker* ended his molestation only when the victim "pull[ed] a blanket over her face to make him stop" (*Baker*, *supra*, 20 Cal.App.5th at p. 725), and the petitioner in *Rodriguez* was found with his trousers unzipped and his

---

subd. (e)(2) [sexual battery by touching "through the clothing of the victim" is a misdemeanor]; see *People v. Dayan* (1995) 34 Cal.App.4th 707, 716.)

18

victim's skirt raised when "curious citizens" intervened (*Rodriguez, supra*, 14 Cal.3d at pp. 643–644, fn. 5).

The only evidence of the duration of any instance of touching is the video recording in which the touching lasted about 12 seconds.  Even if each instance lasted that long, the sum of the instances encompassed less than one minute, which is less than the "few minutes" that the fondling "episode" took in *Rodriguez*.  (*Rodriguez, supra*, 14 Cal.3d at p. 655.)

Significantly, there is no substantial evidence that defendant harmed the girls physically or psychologically.[11] Although G. and M. said they felt "uncomfortable" when they realized what had occurred, there is no evidence that defendant, in contrast to the defendant in *Baker*, inflicted any "level of psychological harm" on the victims.  (*Baker*,

_____

[11] The probation officer's report states that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness."  The record does not support this statement.

We do not suggest that the defendant's acts were without harm.  Defendant's offensive touching of G. and M. violated, at least, their rights to privacy and their interest in bodily autonomy and security.  (See Rest.3d Torts, Intentional Torts to Persons (Tent. Draft No. 1, 2015) § 101, com. b [right not to suffer offensive physical contact with one's body is "rooted in fundamental interests in autonomy, or freedom of choice over one's body"]; Civ. Code, § 1708.5, subd. (f) [sexual battery includes "contact that offends a reasonable sense of personal dignity"]; Sacks, *Intentional Sex Torts* (2008) 77 Fordham L.Rev. 1051, 1074 ["[d]ignitary harm is presumed to flow from interference with bodily autonomy"].)

19

*supra,* 20 Cal.App.5th at p. 725.)  Indeed, according to Mario, the girls have had counseling and "both are fine."

The Attorney General nevertheless suggests that the girls may have suffered psychological damage, and points to Dr. Jones's testimony regarding the effects of child abuse on some victims.  Dr. Jones, however, did not interview G. or M. and expressed no opinion as to whether they had been abused or would suffer any ill effects of defendant's conduct.  The Attorney General's assertion is thus speculative.

In considering the nature of the offense, the fact that defendant committed his crimes multiple times against two victims is, of course, significant and justifies a penalty more harsh than if defendant had committed fewer instances or against one victim only.  (See *Christensen*, *supra*, 229 Cal.App.4th at p. 808 [" 'penalties for single offenses . . . cannot properly be compared to those for multiple offenses' "].)  Without diminishing the seriousness of multiple instances and victims involved, however, even when the occurrences of brief, over-the-clothes touchings are considered cumulatively, in light of all other circumstances in this case, the "degree of danger" that defendant's crimes "present to society" (*Lynch*, *supra*, 8 Cal.3d at p. 425) is not greater than the petitioner's conduct in *Rodriguez*.

Regarding the nature of the offender, there is little in the record to suggest that defendant remains a danger to society.  Unlike the petitioner in *Rodriguez*—who was caught with his trousers unzipped and his victim's skirt raised—and the defendant in *Baker*—who stopped molesting his victim only when she covered herself with a blanket—there is no evidence that defendant intended to commit any act more serious than

20

the acts he committed. Upon being confronted by Mario with the evidence of his conduct, defendant expressed remorse, asked for forgiveness, and promised never to do it again—a promise he kept. There is no evidence that he had ever committed any wrongful act toward others, including any of the children in his charge as a church choir leader for more than 10 years. He has no record of any prior criminal activity other than his convictions 26 years earlier for driving with a suspended license and driving under the influence. During his police interview, he insisted he has changed and vowed that he would never commit such acts again against anyone—a credible assertion in light of his kept promise to Mario made more than one year earlier.

Even if we assume that defendant testified falsely that he did not commit the crimes at all, the record demonstrates that defendant was far less of a danger to society than the petitioner in *Rodriguez*, who, in addition to fondling a six-year-old girl for which he was imprisoned, was convicted of statutory rape, arrested for child molestation, diagnosed a sexual psychopath, and an escapee from a state hospital. (*Rodriguez*, *supra*, 14 Cal.3d at pp. 643–644, fns. 5 & 6.)

Based on all the facts and circumstances concerning the nature of the offenses and the offender, a sentence of life in prison for this defendant for the crimes committed in this case shocks our conscience and offends fundamental notions of human dignity. The sentence therefore violates California's constitutional prohibition against cruel or unusual punishment. (*Lynch*, *supra*, 8 Cal.3d at p. 424.)

Our conclusion is further supported by the second method for determining disproportionality: comparing defendant's punishment with the punishment for more serious offenses under

California law.  (See *Lynch*, *supra*, 8 Cal.3d at p. 426.)  Here, defendant touched the victims' genitalia over their clothes while they slept.  Because there were two victims, the court sentenced him under the One Strike law to indeterminate terms with a maximum of life in prison.  By comparison, one who is convicted of raping children under 14 years of age when the children are incapable of resisting because they are asleep or intoxicated may be sentenced to a term of three, six, or eight years per crime.  (§§ 261, subd. (a)(3) & (4), 264, subd. (a).)  The One Strike law does not apply to such crimes, so even its commission against two victims would result in no more than a 16-year determinate term, assuming the upper term is imposed on each count and the two terms run consecutively.  The punishment is the same for rape of a spouse and sodomy when the victims are likewise incapable of resisting.  (§ 262, subd. (a)(2) & (3); § 286, subds. (f) & (g).)  Assault of a minor with intent to commit certain sex offenses—including rape, sodomy, oral copulation, or sexual penetration—is punishable by five, seven, or nine years in prison.  (§ 220, subd. (a)(2).)  Pimping or pandering a child under the age of 16 years old for prostitution is punishable by up to eight years (§§ 266h, subd. (b)(2), 266i, subd. (b)(2)), and abducting a minor for prostitution is punishable by no more than three years.  (§§ 266a, 18.)  Sexual penetration or sodomy with a child under 14 years and more than 10 years younger than the perpetrator is punishable by up to eight years (§§ 286, subd. (c)(1), 289, subd. (j)), and one who restrains a minor and commits a sexual battery that involves touching the skin of the minor's sexual organs where the defendant has been previously convicted of the same crime is punishable by no more than four years in prison.  (§ 243.4, subds. (a), (f), (g)(1) & (j).)  Incest between an uncle and

niece is punishable by a maximum of three years. (§§ 285, 18.) None of the foregoing crimes is punishable under the One Strike law or subject to a life sentence even if committed on multiple occasions and against multiple victims.

Although the One Strike law imposes the same punishment for numerous other sexual offenses, such offenses are generally far more serious than the crimes defendant committed, particularly in light of the brief over-the-clothes touching manner in which he committed them. Under the One Strike law, for example, 15-years-to-life terms are imposed when the crimes of rape, sexual penetration, sodomy, and oral copulation are committed with the use of force, violence, or fear of immediate bodily injury, and when rape is forcibly committed in concert with others. (§ 667.61, subd. (c).) Strikingly, rape, sexual penetration, sodomy, and oral copulation are *not* subject to punishment under the One Strike law if they occur because the victim is unconscious, asleep, or intoxicated, or the perpetrator has threatened the victim with arrest or deportation (see §§ 261, subd. (a)(3), (4) & (7), 262, subd. (a)(2), (3) & (5), 286, subds. (f), (i) & (k), 667.71, subd. (c)), but defendant's over-the-clothes touching of G. and M. while they slept subjected him to the heightened punishment.

The Attorney General points out that if defendant had been previously convicted of committing a lewd act on a child and then committed a subsequent act, he "could have faced a 25-year-to[-]life sentence." (See §§ 667.61, subds. (a), (c)(8) & (d)(1), 667.71, subds. (a) & (c)(4).) The greater sentence under this hypothetical, however, depends upon a prior *conviction* for a sex offense. Such a sentence might thus be justified by the fact that the perpetrator, having already been

23

convicted of a sex offense, had "not been deterred by more conventional approaches to punishment." (*Ewing v. California* (2003) 538 U.S. 11, 24–25 [upholding "Three Strikes" law because the state has a valid interest in "incapacitating criminals who have already been convicted of at least one serious or violent crime"].)  Here, however, defendant had never been convicted of a sex offense.  The comparison to the punishment one would receive as a recidivist sexual offender, therefore, is inapt.

Based on our comparison of defendant's punishment with lesser punishments imposed for more serious crimes involving sexual behavior, defendant's punishment is unconstitutionally disproportionate.[12]

We now turn to the remedy.  Under the authority of section 1260, some courts have modified an unconstitutional sentence to impose a certain and constitutional punishment. (See *People v. Schueren* (1973) 10 Cal.3d 553, 561-562 [where defendant was charged with a crime for which the maximum penalty was 14 years in prison and convicted of a lesser crime for which he was sentenced to an unconstitutional indeterminate maximum-life term, court reduced the sentence to the maximum permitted under the charged crime]; *Dillon*, *supra*, 34 Cal.3d

---

[12] Because our conclusion is supported by the first two methods identified in *Lynch*, we need not undertake the third method, a comparison of defendant's punishment with the punishment for similar crimes in other jurisdictions. (See *People v. Norman* (2003) 109 Cal.App.4th 221, 230 [disproportionality need not be established under each *Lynch* technique].)  We also need not determine whether defendant's punishment violates the Eighth Amendment to the United States Constitution

at p. 489 (plur. opn. by Mosk, J.) [where Court held that the defendant's sentence for first degree murder was constitutionally excessive, it reduced the sentence to the punishment for second degree murder].)

Generally, however, appellate courts have declined to direct imposition of a particular sentence and simply remanded with directions to resentence the defendant in light of the views expressed in the reviewing court's opinion. (See, e.g., *People v. Keogh* (1975) 46 Cal.App.3d 919, 935 [56-year sentence for four forgery convictions was unconstitutional; court "remanded for resentencing in light of the views expressed in [the] opinion"]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1249 [de facto life sentence for juvenile reversed; court remanded case for a new sentencing hearing without explicit direction]; *People v. Mendez, supra*, 188 Cal.App.4th at p. 68 [same]; *In re Nunez* (2009) 173 Cal.App.4th 709, 739 [same].)

Here, defendant contends that we should remand with directions to resentence defendant based upon the determinate terms specified for violating the crime he committed without regard to the unconstitutionally applied One Strike law. That is, the court should sentence defendant under section 288, subdivision (a), to three, six, or eight years for each of the four counts for which there is substantial evidence, taking into account appropriate aggravating and mitigating circumstances and exercising its discretion as to whether such terms shall run concurrently or consecutively. Although the Attorney General had an opportunity to respond to this point in supplemental briefing, he offered no alternative. We do not disagree with the defendant's proposed remedy, but decline to mandate it. Although upon remand, the trial court may not impose

25

punishment under the One Strike law for the reasons set forth above, we otherwise defer sentencing decisions to the trial court to be made in accordance with the views we have expressed. [13]

## III.  Defendant Was Not Denied Ineffective Assistance of Counsel For Failing to Object to CSAAS Evidence

Defendant contends that his trial counsel's performance was constitutionally deficient because counsel failed to object to Dr. Jones's testimony on CSAAS as irrelevant and prejudicial. We reject this contention because defendant has failed to establish that any deficiency in counsel's performance was prejudicial.

"To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 389.)  To establish prejudice, "the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*Ibid.*) Courts need not determine whether counsel's performance was deficient before examining whether defendant has established

---

[13]  In addition to supplemental briefs regarding the cruel or unusual punishment question, we requested and received supplemental briefs addressing questions regarding the court's decision to impose consecutive 15-years-to-life terms for two of the four counts.  Because of our conclusion that the indeterminate life-maximum terms are unconstitutional as applied here, we need not reach these additional issues.

prejudice as a result of any alleged deficiency.  (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Cox* (1991) 53 Cal.3d 618, 656.)

Testimony regarding CSAAS is inadmissible to prove that child abuse occurred.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).)  It may, however, be " 'admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation.' "  (*People v. Wells* (2004) 118 Cal.App.4th 179, 188 (*Wells*).)  "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust.  Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings."  (*Bowker, supra,* 203 Cal.App.3d at p. 394.)  Although the admissibility of CSAAS evidence is dependent upon the need, as shown by the evidence, to disabuse jurors of misconceptions and myths about reactions to child abuse, the prosecutor may offer CSAAS evidence during the case-in-chief once the victim's credibility has been placed in issue.  (*People v. Patino, supra,* 26 Cal.App.4th at p. 1744; Couzens & Bigelow, Sex Crimes:  Cal. Law and Procedure (The Rutter Group 2016) Trial, § 12.8(d), p. 12-38.)

When expert CSAAS evidence is admissible, the "evidence must be tailored to address the specific myth or misconception

suggested by the evidence." (*Wells*, *supra*, 118 Cal.App.4th at p. 188.) It must also be "limited to discussion of victims as a class . . . and [may] not extend to discussion and diagnosis of the witness in the case at hand." (*People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100.) Lastly, the jury must be instructed "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.)[14]

Defendant and the Attorney General disagree as to whether any objection to Dr. Jones's testimony about CSAAS would have been sustained. In particular, they dispute whether there was any evidence that the victims displayed any behavior, such as delaying their disclosure of the abuse or failing to call out for help when the lewd conduct occurred, that would have made Dr. Jones's testimony regarding CSAAS relevant. We need not decide these issues because even if an objection would have had merit and defense counsel was constitutionally deficient for failing to assert it, defendant has failed to show a reasonable probability that, if Dr. Jones's testimony was excluded, the result of the proceeding would have been different.

Defendant's defense at trial was that he did not touch G. or M. as alleged. As defendant argues, this is a "he-said-she-said" case in which defendant "denied the molestation" occurred.

_____

[14] In the instant case, the jury was instructed: "Jayme Jones'[s] testimony about [CSAAS] is not evidence that . . . defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the] complaining witnesses' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

The evidence that defendant committed the lewd acts, however, was compelling. Not only did G. and M. testify that defendant had touched their vaginas, but Mario testified that defendant admitted to him that he did so, and that he asked Mario for forgiveness. And, during his police interview, defendant admitted touching and rubbing the girls' legs and "vagina[s]."

At trial, defendant denied that he made the admission to Mario. The denial, however, was impeached with his statements to police officers about his conversation with Mario. An officer asked him, "when your good friend told you that you touched the girls' vaginas, what did you say?" Defendant responded: "I asked for forgiveness. I said, forgive me and it won't happen again. It won't happen again. I told him like that. He knows that I asked for forgiveness and I told him it wouldn't happen again." The defendant's response corroborates Mario's testimony regarding the conversation.

Defendant also asserted that he made his admissions during the police interview because the officer told him "if I wanted to go home, when I came to see the judge, that I should do—that I should state there so the judge would believe me." Although this testimony is unclear, it suggests that defendant made the admission because the officer told him the admission would benefit him when he appeared before "the judge." The transcript of the interview, however, does not support this suggestion. Indeed, it was only after defendant had admitted touching the girls that he and an officer discussed what would happen next. Defendant wanted to know if he was "going to get out or what?" The officer told defendant that they will "take this to court" and the "court decides what's going to happen." Defendant then asked for the officer to "help" him. The officer

said that she asked defendant "to tell [her] the truth about what happened," so that she could "explain to the judge, to the attorneys what happened." She would "explain it all" and then the "court decides what's going to happen" and whether defendant would "get out or not." Defendant again asked for help and promised the officer "that it won't happen again." There is nothing to indicate that the officers told or suggested to defendant to admit to touching the girls as a means of gaining favor before a judge.

Even if the evidentiary prerequisites to CSAAS evidence were lacking in this case and, therefore, Dr. Jones's testimony should have been excluded as irrelevant, her testimony was limited to the discussion of child abuse victims generally and how their seemingly paradoxical behavior can be explained by the CSAAS model; she specifically testified that she had not interviewed any victims or witnesses in this case and she was not in court to render an opinion as to whether G. or M. are victims of sexual abuse. The prosecutor did not mention Dr. Jones's testimony in his arguments to the jury, and the jury was instructed that her "testimony about [CSAAS] is not evidence that . . . defendant committed any of the charged crimes against him"; they could "consider this evidence only in deciding whether or not [the] complaining witnesses' conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." We assume the jury followed this instruction. (See *People v. Wilson* (2008) 44 Cal.4th 758, 798.)

In light of the overwhelming evidence that defendant had touched the girls in the manner alleged in counts 1, 2, 4, and 5, the lack of support for defendant's defense, the nature

30

of Dr. Jones's testimony, the absence of any reference to her testimony during closing arguments, and the court's instruction regarding the limited purpose of the testimony, there is no reasonable probability that defendant would have obtained a more favorable result if the testimony had been excluded.

Defendant further argues that Dr. Jones indicated that the touching that occurred in this case "was 'equal' to 'a full-on penetration of a penis and a vagina,' " and thus suggested the defendant "was a rapist." The argument is without merit. In the pages defendant cites for this argument, Dr. Jones merely testified that in terms of the traumatic impact on a child, the closeness of the relationship between the child and the abuser tends to be more important than the nature of the abuse. She also testified that even a "minimal amount of abuse" that does not involve sexual penetration can have an effect on the child. Nothing in the record suggests that Dr. Jones stated or implied that defendant's touching was equal to sexual penetration or that defendant was a rapist.

## IV.    Court Must Correct Custody Credits

Cadena contends he is entitled to three additional days of presentence custody credit because the court miscalculated the days that he spent in actual custody. The Attorney General concedes the point, and points out the actual number is four additional days, not three. We agree defendant is entitled to four additional days.

When calculating conduct credit, the court must take into account the days of arrest and sentencing, as well as all days in between spent in custody. (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) Defendant was in custody from April 12, 2016 to February 22, 2017, which is 317 days, but he was awarded only

31

313 days of custody credit.  He is entitled to the additional four days.

## V. Defendant's Argument For Trial Court Discretion to Strike the One Strike Law Special Circumstance is Moot

Defendant argues that the policies underlying recent statutory amendments that grant to trial courts the authority to strike or dismiss firearm enhancements under section 12022.53 (Stats. 2017, ch. 682, § 2), or prior convictions under the Three Strikes law (Stats. 2018, ch. 1013, § 1), should be applied to permit the court the same power to strike the special circumstance findings under the One Strike law.  This issue, however, is mooted by our holding that the One Strike law was applied in an unconstitutional manner in this case, and that defendant should be sentenced under section 288, subdivision (a).

## DISPOSITION

The convictions on counts 3 and 6 are vacated based on insufficiency of evidence and the sentence is vacated as unconstitutionally excessive. The judgment is otherwise affirmed. The superior court shall hold a new sentencing hearing in accordance with the views expressed herein.

CERTIFIED FOR PARTIAL PUBLICATION.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.

33